WRIGHT, COMPTROLLER GENERAL OF GEORGIA, *v.* CENTRAL OF GEORGIA RAILWAY COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF GEORGIA.

No. 161. Argued January 28, 29, 1915.—Decided March 22, 1915.

This court will not presume that a state legislature in granting a charter containing exemptions would either practice deceit or make a futile grant.

A lessee of railroads which were built under special charters containing irrepealable contracts by which the property was not subject to be taxed higher than a specified per cent on the annual income derived therefrom is not subject to an *ad valorem* tax as the owner of such property.

The statutes of Georgia in regard to the taxation of railroads involved in this action are construed as making the fee exempt from other taxation than that provided for in favor of the lessee as well as of the lessor.

While technical distinctions should be avoided as far as may be in matters of taxation in the interest of substantial justice, they should not be disregarded in order to enable a State to escape from a binding bargain; and so *held* in regard to distinctions between lessors and lessees where the protection of the latter is necessary in order to make good the promise of the State made to the former.

The courts cannot take the place of the taxing power nor can taxes based on ownership of the property be enforced against a lessee of the property under the statutes of Georgia and the leases involved in this case.

206 Fed. Rep. 107, affirmed.

The facts are stated in the opinion.

*Mr. John C. Hart* and *Mr. Samuel H. Sibley* for appellant.

The contracts for exemptions are personal, are not vendible nor transferable, and are valid only so long as those companies as such conducted the business of common carriers. The state charter contracts limiting the tax rate is personal to these corporations to whom granted and did not run with the property, not having been transferred to the Central of Georgia Railway with the consent of the State at a time when the State could consent, and cannot be invoked by lessee, for its own benefit.

The person with whom the contract is made by the State may continue to enjoy benefits unmolested as long as he chooses, but there his rights end, and he cannot by any form of conveyance transmit the contract or its benefits to a successor. *Rochester Ry.* v. *Rochester*, 205 U. S. 247; *Morgan* v. *Louisiana*, 93 U. S. 217; *Wilson* v. *Gaines*, 103 U. S. 417; *Louis. & Nash. R. R.* v. *Palmes*, 109 U. S. 244; *Pickard* v. *Tennessee &c.*, 130 U. S. 637; *St. Louis &c. R. R.* v. *Gill*, 150 U. S. 649; *Nor. & West. Railroad Co.* v. *Pendleton*, 156 U. S. 667.

The Constitution of the State forbids exemption. Article 7, § 2, par. 1; *Rochester Ry.* v. *Rochester*, 205 U. S. 247; *Trask* v. *McGuire*, 18 Wall. 391; *Shields* v. *Ohio*, 95 U. S. 319; *Maine Central R. R.* v. *Maine*, 96 U. S. 49; *Railroad*

*Co.* v. *Georgia,* 98 U. S. 359; *Yazoo R. R.* v. *Adams,* 180 U. S. 1; *Grand Rapids &c. R. R.* v. *Osborn,* 193 U. S. 17; *San Antonio Traction Co.* v. *Altgelt,* 200 U. S. 304.

Whether the exemption claimed is total or a commuted tax rate it stands upon the same principle. *Great Northern Ry.* v. *Minnesota,* 216 U. S. 207.

A lessee in perpetuity is the owner of property for the purpose of taxation. Civ. Code Georgia, 1911, § 1018; *Penick* v. *Atkinson,* 139 Georgia, 649; *Wells* v. *Mayor,* 87 Georgia, 397; *Perry* v. *Norfolk,* 220 U. S. 479; *Cincinnati College* v. *Yeatman,* 30 Oh. St. 276; *Street* v. *Columbus,* 75 Mississippi, 822; *Washington Market Co.* v. *Dist. of Col.,* 4 Mackay, 416.

The lessee, now the appellee, contracted to pay the taxes in question.

Neglect to pay taxes in the past is no reason for future exemption. *Wells* v. *Savannah,* 181 U. S. 547.

Neither the action nor the inaction of the Tax Department could raise an exemption. Art. 4, § 1, par. 1.

*Mr. A. R. Lawton* and *Mr. T. M. Cunningham, Jr.,* for appellee.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by the Railway Company, the appellee, to prevent the collection of certain taxes, which, it is alleged, would be contrary to Article I, § 10, and to the Fourteenth Amendment of the Constitution of the United States. The case was heard on bill, demurrer and answer and certain agreed facts, and the District Court issued an injunction as prayed. 206 Fed. Rep. 107. The facts stripped of details not material to the question before us, are as follows: In 1912 the defendant issued executions against the plaintiff to collect *ad valorem* taxes on the "real estate, road bed, and franchise value,

after crediting . . . one-half of one per cent. of the net income, : . . on that portion of its property known in its system" respectively as the Augusta and Savannah Railroad and the Southwestern Railroad. These roads were built under special charters admitted to constitute irrepealable contracts, by which the property was not subject to be taxed higher than one-half of one per cent. upon the annual income—so that it may be assumed that the present taxes could not be sustained if the roads still were in the separate hands of the corporations that built them.

But in 1862, the Augusta and Savannah Railroad and in 1869 the Southwestern Railroad made leases of their respective roads and franchises to the Central Railroad and Banking Company of Georgia during the continuance of the charters of the lessors. In 1892 the property of the lessee went into the hands of a receiver, and the lessors, being allowed an election by the court, elected to allow the property to remain in his hands, which it did until a sale of the same and purchase, under a reorganization plan, by the appellee, the Central of Georgia Railway Company. In 1895 by agreement between the latter and the two lessors the leases were modified so as to run for one hundred and one years from November 1 of that year, renewable in like periods upon the same terms forever. Notwithstanding these leases the State has been content down to this time to collect from the lessors the tax provided for in their charter, but now, conceiving the State and its officers to have been mistaken, the Comptroller seeks to tax the whole property to the lessee.

The executions are for taxes on property of the plaintiff and must show jurisdiction to issue them. *Harris* v. *Smith,* 133 Georgia, 373, 374; *Equitable Building & Loan Ass'n* v. *State,* 115 Georgia, 746. Here the jurisdiction depends upon these roads being in effect the plaintiff's property as matter of law. If they are not, the attempt is an attempt

to tax the plaintiff upon property that it does not own. To decide whether these taxes are such an unjustified exaction we must turn to the legislation of the State, bearing in mind that the practical construction given to the law for nearly half a century is strong evidence that the plaintiff's contention is right. *Wright* v. *Georgia R. R. & Banking Co.*, 216 U. S. 420, 426; *Temple Baptist Church* v. *Georgia Terminal Co.*, 128 Georgia, 669, 680.

The charter of the Augusta and Waynesboro' Rail Road, afterwards the Augusta and Savannah, approved December 31, 1838, alongside of the taxing provision in § 13 to which we have referred, provided as follows in § 16: "That said Company shall at all times have the exclusive use of the said Rail Road, for the transportation or conveyance of merchandise, goods, wares, and freight of every kind, and passengers, over the said Rail Road, so long as they see fit to use this exclusive privilege, and said company shall be authorized to charge the same rates for freight or passage as are allowed in the charter of the Georgia Rail Road and Banking Company: Provided always, that said company may, when they see fit, rent or farm out all or any part of their exclusive right of transportation of freight, or conveyance of passengers, with the privilege, to any individual or individuals, or other company, and for such term as may be agreed upon"—it being added that the Company in the exercise of the right of transportation, or the persons or company "so renting from said company . . . shall, so far as they act on the same, be regarded as common carriers." (Laws of 1838, p. 174, at p. 179.)

It will be perceived that when this section was drawn it was supposed that different persons might be allowed to put their carriages upon the new form of road, as perhaps may be seen even more clearly in other early charters in Georgia and elsewhere. And the revenue that was to be derived from the exclusive privilege granted might be

obtained by doing the whole business, by letting in others to share a part of it, or by making a lease of the whole. Any one, of the three courses is permitted; one deemed as likely as another, and also so far as appears, all standing alike in the mind of the legislature in respect of any legal effect upon the other grant of rights.

The foregoing view of § 16 would lead us to believe that no change in the matter of tax exemption was expected to follow from the demise of the road, any more than it would have followed from the admission of another carrier to partial rights, or of an individual to carry his own goods. But that is only an introduction to further considerations. We cannot suppose that the Legislature meant either to practice a cunning deception or to make a futile grant. Therefore, we are unable to read the charter as making the exemption vain by reserving to the State an unlimited right to impose upon the lessee all that it had renounced as against the lessor. For that was to give notice to the parties, if they were supposed to know the law, that the exemption would be lost if the income was earned in one of the contemplated ways—or, if they were supposed ignorant, was to invite them to a bargain that was to have an unexpected and disastrous result.

After the charter came a special act of January 22, 1852 (Laws of 1852, p. 119), which authorized the Central Railroad and Banking Company "to lease and work for such time and on such terms as may be agreed on by the parties interested," the two roads with which we are concerned, among others, and reciprocally giving power to the corporations owning those roads "so to lease to the Central Railroad and Banking Company of Georgia their respective Railroads for such term of time and on such other terms as they respectively may deem best." In the interval the Rail Road had become a Railroad—but we see no ground for believing that there has been any change in the attitude of the State toward the pioneer enterprises

that it was encouraging a few years before. We still cannot suppose that it was inviting the lessors to lose the benefit of their exemption or the lessees to find themselves entrapped with a burden made possible only by accepting the invitation of the act.

We are not suggesting that the contract in the charters of the lessors passed by assignment to the lessee, nor are we implying that the property was exempted generally, into whosesoever hands it might come. We are dealing only with the specific transaction permitted and encouraged by the Acts of 1838 and 1852, and saying that we cannot reconcile it with our construction of those acts to allow that transaction to change the position for the worse. We construe those statutes as making the fee exempt from other taxation than that provided for, in favor as well of the lessee as of the lessor—the protection of the lessee being necessary in order to make good that promised to the lessor.

The present instruments, made in pursuance of the foregoing powers in October, 1895, purport to 'demise, lease and to farm let' the property for the term of one hundred and one years, renewable as above stated. The lessee covenants to pay a fixed rent semi-annually and various expenses incident to taking over the occupation of the road and there is a clause of reëntry in case of failure for six months to make the semi-annual payment as agreed. Meantime, however, the Code of 1861 had introduced distinctions, hard to grasp for one trained only in the common law of real property, between the usufruct of a tenant and an estate for years; Code of 1910, §§ 3685, 3687, 3690, 3691; and it is argued that these leases created estates of such a nature that the lessee was practically in the position of owner subject to a rent charge, and was taxable for the land. We agree that technical distinctions are to be avoided as far as may be in matters of taxation, and we are not curious to insist upon the differences be-

tween a lease, having about eighty-five years to run, that may, not must, be renewed in perpetuity, and a fee subject to a rent charge.   But the disregard of technical distinctions is in the interest of substantial justice, not for the purpose of enabling the State to escape from a binding bargain.   If we are right in our interpretation of the statute from which the parties to the leases got their powers, this later legislation of Georgia is immaterial or should not be construed as embracing an attempt to escape from a contract by a subtlety that almost defies ingenuity to understand.   See *Wright* v. *Georgia R. R. & Banking Co.,* 216 U. S. 420, 432.

The executions, as we have said, must stand or fall on the jurisdiction that they disclose.   They attempt to tax the fee as the property of the plaintiff.   The injunction runs only against taxing the plaintiff as owner.   We discuss nothing but the question before us.   For the reasons that we have given we are of opinion that the taxes cannot be collected on the present executions.   The court cannot take the place of the taxing power.   *Yost* v. *Dallas County, ante,* p. 50.   It follows that the injunction must be sustained.

*Decree affirmed.*


MR. JUSTICE LAMAR took no part in this decision.


MR. JUSTICE HUGHES with whom MR. JUSTICE PITNEY concurs, dissenting.


It has repeatedly been declared by this court to be settled law that tax exemptions, or tax limitations, are personal to the grantee, that is, are non-transferable and do not run with the property unless the legislature has explicitly provided otherwise.   It has been held not to be enough that the grantee is authorized to make a conveyance of all its property, estate, privileges and fran-

chises. *Morgan* v. *Louisiana*, 93 U. S. 217; *Wilson* v. *Gaines*, 103 U. S. 417; *Louisville & Nashville R. R.* v. *Palmes*, 109 U. S. 244; *Memphis &c. R. R.* v. *Railroad Commission*, 112 U. S. 609; *Chesapeake & Ohio Ry.* v. *Miller*, 114 U. S. 176; *Picard* v. *Tennessee &c. R. R.*, 130 U. S. 637; *St. Louis &c. Ry.* v. *Gill*, 156 U. S. 649; *Norfolk & Western R. R.* v. *Pendleton*, 156 U. S. 667; *Phœnix Fire Ins. Co.* v. *Tennessee*, 161 U. S. 174; *Rochester Railway* v. *Rochester*, 205 U. S. 236. As the court said in the last-mentioned case (p. 248) after fully reviewing the authorities: "A legislative authorization of the transfer of 'the property and franchises,' . . . of 'the property,' . . . of 'the charter and works,' . . . or of 'the rights of franchise and property,' . . . is not sufficient to include an exemption from the taxing or other power of the State, and it cannot be contended that the word 'estate' has any larger meaning." And it was further held (p. 252) that it must be regarded as the established rule "that a statute authorizing or directing the grant or transfer of the 'privileges' of a corporation, which enjoys immunity from taxation or regulation, should not be interpreted as including that immunity." See also *Wright* v. *Georgia R. R. & Banking Co.*, 216 U. S. 420, 437. The controlling principle of these decisions is that, in view of the supreme importance of the taxing power of the State, every doubt must be resolved in favor of its continuance: "This salutary rule of interpretation is founded upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and, therefore, not to be extended beyond the exact and express requirement of the grants, construed *strictissimi juris*." *Memphis &c. R. R.* v. *Railroad Commission*, *supra* (p. 617). "If the legislature can lay aside a power devolved upon it for the good of the whole people of the State, for the benefit of a private party, it must speak in such unmistakable terms that they will not admit of any

reasonable construction consistent with the reservation of the power." *Picard* v. *Tennessee &c. R. R., supra,* (p. 641).

I do not find a word in the statutes of Georgia which confers any immunity from the taxing power upon this appellee. The question relates to *its* interest, not to that of the original companies. What that interest or property may be, and how it is to be assessed, is another question. The first inquiry is whether the appellee has any immunity under the contract clause and that, I submit, is answered, when it is found that it has no contract of its own and no stipulation for a transfer to it of the immunity of others.

The principle which precludes the implication of such a transfer applies equally to leases—even leases for ordinary periods. A lessee is in no better position to claim tax exemptions, or limitations, than a mortgagee, or a purchaser at a foreclosure sale, who under legal authority takes all the property, franchises, and privileges, of the mortgagor. The question as to a leasehold interest was presented in *Jetton* v. *University of the South,* 208 U. S. 489. There, the State had granted an exemption to the University of one thousand acres of land. The University gave leases of lots within this tract and thus a village community was developed. An effort was made by the State to tax the property against the University upon the ground that the leases took it out of the exemption. But the state court held otherwise; the property could not be taxed against the University. *University of the South* v. *Skidmore,* 87 Tennessee, 155. Thereupon the State, under new legislation authorizing the taxing of leasehold interest, assessed the lessees, and the University with the lessees brought suit in the Federal court to enjoin the collection of the taxes upon the ground of impairment of contract. The Circuit Court entered a decree in favor of the University and enjoined the assessment. On the appeal to this court, it was urged in support of the decree that,

in taxing the leased property, the tax was placed upon
the only use to which the property could be put in order
that it might be made of benefit to the University. In-
deed, it was said that the assessment under the legisla-
tive act destroyed the value of the exemption; that is,
that it was necessary to protect the lessee in order to save
the contract right. But this court overruled these con-
tentions. It was thought to be 'plain that an exemption
granted to the owner of the land in fee does not extend
to an exemption from taxation of an interest in the same
land, granted by the owner of the fee to another person
as a lessee for a term of years.' The immunity of the one
gave no immunity to the other, and the contract of ex-
emption did not imply 'in the most remote degree' that
the State would not thereafter 'so change its mode of
assessment as to reach the interest of a lessee directly.'
The State taxed what it had a right to tax, the lessee's
interest, even though it could not tax the University.
The exemption, said the court, 'lasts only so long as the
university owns the lands, and when it conveys a certain
interest in them to a third person it no longer owns that
interest, which at once becomes subject to the right of
the State to tax it.' In the present case, it may be as-
sumed that, what the appellee has, it has acquired law-
fully, but it cannot claim to be immune from taxation
or plead the contract of another.

I emphasize this, for it seems to me that its full recogni-
tion is important to a proper determination of the case,
and that what is denied to the appellee under the con-
tract clause should not be asserted and permitted to have
a dominating effect under another name. Nor would
there be any basis for an imputation of unfair dealing
or sharp practice, in case a State undertakes to tax the
property of a company which itself has no immunity from
taxation, simply because its grantor had an immunity
which it was not able to transfer. The appellee says in

its argument that it 'is not claiming any tax exemptions,' and, as in fact it appears to have none, we should deal with the case upon this footing.

What then is the relation of the appellee to the property in question? Its predecessor, the Central Railroad & Banking Company of Georgia, had leased the railroad properties of the Augusta & Savannah and Southwestern companies, respectively, in perpetuity, or during the entire existence of the lessor companies. The property of the Central Railroad & Banking Company of Georgia was sold under foreclosure in 1895, and the appellee was organized as a successor corporation and leases to it of the railroad properties in question were executed by both the original companies 'for the full term of one hundred and one years, and renewable in like periods upon the same terms forever.' The rental in each case was the fixed sum of five per cent. on the amount of the capital stock then outstanding, that is to say, the sum of $51,145 in the case of the Augusta & Savannah Company and $259,555 in the case of the Southwestern Company. In short, under what is termed a lease the appellee took the entire property to hold, if it pleased, in perpetuity, subject to an annual charge of the amounts specified.

Dealing with the substance of things, as we must when the Constitution of the United States is involved—and not with mere forms or names—I am unable to see how an *ad valorem* tax against the appellee upon the property which it thus holds is a violation of due process of law under the Fourteenth Amendment. Under a system which tolerates such incongruities as the taxing of the entire value of the land to the owner of the equity of redemption, while the interest of the mortgagee is separately taxed, it would seem to be difficult to find ground for a constitutional objection to the treatment of the holder of a perpetual lease as virtual owner. See *J. W. Perry Co.* v. *Norfolk*, 220 U. S. 472, 478. In the language of Mr. Chief

Justice Bleckley in *Wells* v. *Savannah*, 87 Georgia, 397, 399 (see 181 U. S. 531, 544, 545): "The value of property consists in its use, and he who owns the use forever, though it be on condition subsequent, is the true owner of the property for the time being. This holds equally of a city lot or of all the land in the world. Where taxation is *ad valorem*, values are the ultimate objects of taxation, and they to whom the values belong should pay the taxes. Land sold or by a contract of bargain and sale demised forever subject to a perpetual rent, is taxable as corporeal property; and in private hands the rent also is taxable as an incorporeal hereditament. The tax on the former is chargeable to the purchaser or perpetual tenant, and on the latter to the owner of the rent." It can hardly be said that it makes a constitutional difference that a so-called lessee, who may enjoy forever if it chooses, has also the privilege of giving up the property at the renewal dates. Nor do I understand it to be important, under the Federal Constitution, how the interest of the appellee—which in substance is ownership—is technically described. Surely, the Fourteenth Amendment is not concerned with mere technicalities of tenure; these, the State is free to abolish. And it should be added that we do not have here any question of double taxation, as the State has credited to the appellee against the tax demanded the one-half of one per cent., upon the net income, which was payable by the original companies and the payment of which the appellee had assumed.

In considering the constitutional capacity of the State, we are dealing of course with the question as to what it may do by the exercise of all the power it possesses, and not merely with the interpretation of its existing statutes. *Castillo* v. *McConnico*, 168 U. S. 674, 683. I recognize fully the difficulties in this case, so far as it has to do with the interpretation and application of the Georgia tax laws. And if it were the decision of the court as a mere matter of

construction of the local law—in the absence of a controlling local decision—that the statutes of Georgia did not justify the assessment actually made, I should withhold this expression of dissent; for that would leave the matter, as I conceive it should be left, within the control of the courts and legislature of the State, so far as the mere imposition of an *ad valorem* tax upon the property held and enjoyed by the appellee is concerned.

But I am unable to concur in the view that the tax here sought to be collected violates the Constitution of the United States.

I am authorized to say that MR. JUSTICE PITNEY concurs in this dissent.

MR. JUSTICE McREYNOLDS also dissents.